## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES WALSH, | No. 4:24-CV-01878 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| LUZERNE COUNTY, LUZERNE COUNTY BUREAU OF ELECTIONS, and LUZERNE COUNTY BOARD OF ELECTIONS AND REGISTRATION, | |
| Defendants. | |

### MEMORANDUM OPINION

**APRIL 28, 2025**

Plaintiff James Walsh brings suit to challenge the processing of voter registration and mail-in-ballot applications during the 2024 General Election in Luzerne County. But Walsh won his election and ran unopposed. So if there is any truth to his claims that Luzerne County officials were too slow to process such registrations and applications, these election practices could not possibly have caused him any injury as an unopposed and successful candidate for office. Therefore he is an improper Plaintiff to bring these claims before the Court. Accordingly, Walsh lacks standing to rule upon these claims. Defendants' motions to dismiss are therefore granted with prejudice.

## I.    BACKGROUND

On October 25, 2024, Plaintiff James Walsh filed a complaint in the Court of Common Pleas of Luzerne County, Pennsylvania, naming as defendants Luzerne County, Luzerne County Board of Elections, and Luzerne County Board of Elections and Registration.[1] Walsh also filed a motion for a preliminary injunction.[2] A preliminary injunction hearing was commenced before the Luzerne County Court of Common Pleas on October 30, 2024, which was concluded when counsel for Luzerne County and Luzerne County Bureau of Elections notified the judicial panel of his intent to remove the case to federal court.[3] Defendants Luzerne County and Luzerne County Bureau of Elections filed the notice of removal based upon this Court's federal jurisdiction over the First and Fourteenth Amendment claims that same day.[4]

This Court held a telephone status conference on October 31, 2024.[5] At the status conference, the Court noted its concern that Walsh lacks standing to bring this suit. As also broached at the status conference, Walsh's original complaint incorrectly referred to defendant Luzerne County Bureau of Elections as "Luzerne County Board of Elections." An amended complaint was filed on Friday, November

---

[1]    Luzerne County Court Documents, Doc. 1-2.
[2]    *Id.* at 22.
[3]    Supplement, Doc. 4
[4]    Notice of Removal, Doc. 1; 28 U.S.C. §§ 1331, 1441.
[5]    Scheduling Order, Doc. 3.

1, 2024, which was identical except that it referred to this defendant as "Luzerne Bureau of Elections."[6] Also on November 1, 2024, the Court received letters from counsel indicating that the matter had still not been resolved and that an evidentiary hearing would prove necessary.[7]

Finding itself on the fifth day of a criminal jury trial,[8] the Court scheduled an evidentiary hearing for the following Monday, November 4, 2024.[9] In this Order, as well, the Court explicitly called attention to its concerns over Walsh's lack of standing, indicated that it would consider oral argument on the issue, and cited two cases dealing with the standing of candidates to challenge election practices.[10] Rather than proceeding with this hearing, however, Walsh filed a letter on Monday morning indicating that because the hearing was to take place on the evening before the election, "it would be difficult for any court at all to issue an injunction at 4:00 p.m. that could be practically effective," and thus the motion for a preliminary injunction was withdrawn.[11] Counsel therefore indicated that "the case will proceed

---

[6]    Amended Complaint, Doc. 7.

[7]    Letter from Charles Kannebecker, Doc. 8; Status Report by Luzerne Bureau of Elections, Luzerne County, Doc. 9.

[8]    *See* Minute Entry for Proceedings held before Chief Judge Matthew W. Brann: Jury Trial DAY 5, Doc. 422, *United States v. Bressi*, No. 4:19-CR-0207 (M.D. Pa. Nov. 1, 2024).

[9]    Scheduling Order, Doc. 10.

[10]    *Id.* at 2 & n.3 (citing *Bost v. Ill. State Bd. of Elections*, 114 F.4th 634 (7th Cir. 2024) and *Trump v. Wis. Elections Comm'n*, 506 F.Supp. 3d 620 (E.D. Wis. 2020), *aff'd*, 983 F.3d 919 (7th Cir. 2020)).

[11]    Letter from Charles Kannebecker, Doc. 11; Letter from Charles Kannebecker, Doc. 12.

in normal fashion with Answer, Motion to Dismiss, etc."[12] The evidentiary hearing was cancelled.[13]

Accordingly, defendants filed motions to dismiss on November 15, 2024.[14] Instead of briefing in opposition, however, Walsh requested leave to file a Second Amended Complaint, and noted defendants' consent to amendment.[15] The second amended complaint provided some additional factual allegations, slightly modified its request for relief given that the 2024 election had passed by this point, and correctly referred to Defendant Luzerne County Bureau of Elections instead of referring to it as the "Luzerne Bureau of Elections," as it had in the prior complaint.[16]

Defendants again moved to dismiss.[17] Yet again, Walsh sought, and was granted, leave to amend.[18] This iteration of the complaint corrected the prior complaints' error, which mistakenly stated that Walsh ran for election for Representative of the 119th Legislative District rather than the 117th Legislative District.[19] It was otherwise substantively identical.

---

[12]   Letter from Charles Kannebecker, Doc. 12. Defendant Luzerne County Board of Elections and Registration also filed a consent to removal on this day. Notice, Doc. 13.
[13]   Scheduling Order, Doc. 14.
[14]   Motion to Dismiss for Failure to State a Claim by Luzerne Bureau of Elections, Luzerne County, Doc. 15; Motion to Dismiss for Lack of Jurisdiction by Luzerne County Board of Elections and Registration, Doc. 16.
[15]   Consent Motion for Leave to File Second Amended Complaint, Doc. 20.
[16]   Second Amended Complaint, Doc. 22 at 15-16 & ¶¶48-49.
[17]   Motion to Dismiss for Lack of Jurisdiction by Luzerne County Board of Elections and Registration, Doc. 24; Motion to Dismiss for Failure to State a Claim by Luzerne Bureau of Elections, Luzerne County.
[18]   Consent Motion to Amend/Correct Amended Complaint, Doc. 28.
[19]   Third Amended Complaint, Doc. 30 ¶¶11, 28, 49, 52, 59-60.

Defendants again moved to dismiss the complaint.[20] Because of Walsh's litigation conduct in this case, Defendant Luzerne County Bureau of Elections expressly noted that it would oppose future amendment of the complaint due to "Plaintiff's dilatory motive and, obviously, Plaintiff's repeated failure to even attempt to cure any deficiencies."[21] This time around, Walsh briefed in opposition.[22] Accordingly, the motion is now finally ripe for disposition.

## II.    FACTUAL BACKGROUND

The allegations in this case are relatively straightforward. Defendant Luzerne County Board of Elections and Registration provides general supervision over elections conducted by the County in accordance with federal, state, and local laws and regulations.[23] Defendant Luzerne County Bureau of Elections carries out the edicts, directives, orders, and decrees of the Board in administering elections in Luzerne County.[24] The Plaintiff, James Walsh was a 2024 candidate for Representative of the 117th Legislative District in the Pennsylvania General Assembly.[25] Walsh won his primary race by four votes,[26] and—as he conveniently omits from his third amended complaint—ran unopposed in the general election,

---

[20]    Motion to Dismiss for Failure to State a Claim by Luzerne Bureau of Elections, Luzerne County, Doc. 34; Motion to Dismiss for Lack of Jurisdiction, Doc. 37.
[21]    Brief in Support, Doc. 39 at 7.
[22]    Brief in Opposition, Doc. 41; Brief in Opposition, Doc. 42.
[23]    Third Amended Complaint, Doc. 30 ¶13.
[24]    *Id.* ¶14.
[25]    *Id.* ¶11.
[26]    *Id.* ¶52.

winning a total of 89.46% of the votes.[27] He is now the incumbent state representative for the 117th Legislative District.[28]

Throughout all versions of the amended complaints in this litigation Walsh has alleged deficiencies with respect to two groups of voters, First, Walsh alleges "[u]pon information and belief" that "Defendants are failing and/or refusing to process [] approximately 2,500 additional new applications for voter registration, even though such applications were submitted prior to the October 21, 2024 deadline."[29] Second, Walsh alleges "upon information and belief" that "Defendants are failing and/or refusing to timely process several thousand mail-in vote requests from voters."[30] Walsh's complaint also sets out a history of various prior alleged instances in which Defendants' election procedures were not satisfactory and alleges that Luzerne County officials did not elaborate on their mail-il ballot procedures at

---

[27] The Court takes judicial notice of records confirming that Walsh ran unopposed in the general election. *Morgan v. Pennsylvania*, No. 4:23-CV-0872, 2023 U.S. Dist. LEXIS 177374, at *4-5 (M.D. Pa. Oct. 2, 2023) ("[T]he Third Circuit has followed the prevailing wisdom that documents available on government websites are public records."); Luzerne County, *Election Results Archive*, Accessed Apr. 25, 2025, https://www.luzernecounty.org/404/Election-Results-Archive (providing link to Clarity Elections webpage); Clarity Elections, *General Election November 5, 2024: Luzerne County*, Accessed Apr. 25, 2025, https://results.enr.clarityelections.com/PA/Luzerne/122840/web.345435/#/detail/11 (Stating that Walsh won 89.46% of the total votes, write-in candidates won 5.27% of the total votes, and providing a "scatter" notation for 5.27% of the votes).

[28] Third Amended Complaint, Doc. 30 ¶52.

[29] Third Amended Complaint, Doc. 30 ¶¶8, 24, 26, 39, 42, 47, 58.

[30] *Id.* ¶¶9, 27, 40, 43, 65. Walsh's counsel indicated during the status conference that these numbers had been solely based upon election officials' public statements on October 23, 2024, but that subsequent investigation had revealed only 60 total impacted voters at the time of the October 31 status conference. Curiously, throughout three amendments to the original complaint, counsel continues to state that "approximately 2,500" voter registration applications and "several thousand" mail-in voter applications remain unprocessed.

a public meeting.[31] Other than these allegations, Walsh purely bases his accusations of electoral misconduct upon "information and belief."

Walsh contends that Defendants violated several provisions of the Pennsylvania election code—namely, 25 Pa.C.S. §§ 1328, 3150.12b, and 3150.15— and correspondingly, that their right to vote through the First and Fourteenth Amendments to the United States Constitution have been violated. Section 1328 governs the approval of voter registration applications, requiring among other things to examine and process voter registration applications upon receipt and notify applicants of the results.[32] Section 3150.12b governs the approval process for mail-in ballots, requiring that the county board process such applications and notify electors "immediately" if the applications are not approved.[33] Finally, Section 3150.15 requires that the county board of elections deliver mail-in ballots as soon as applications for mail-in ballots are certified and the ballots are available, and "not later than the second Tuesday prior to the primary or election."[34]

From his second amended complaint onwards, Walsh also provided some additional detail regarding the relationship between these votes and his status as a candidate. Walsh alleges that several of the affected voters resided within the 119th Legislative District in the General assembly; that a majority of these applicants were

---

[31]  *Id.* ¶¶19-22, 66.
[32]  25 Pa.C.S. § 1328.
[33]  25 Pa.C.S. § 3150.12b.
[34]  25 Pa.C.S. § 3150.15.

qualified electors and intended to vote for Walsh; that Walsh's campaign used campaign funds for attorney's fees as a result; and, as stated, that Walsh won his primary by four votes.[35]

## III.    STANDARD OF REVIEW

At the motion to dismiss stage, constitutional standing is jurisdictional and best evaluated under Rule 12(b)(1), whereas prudential standing is best evaluated under Rule 12(b)(6).[36]

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[37] and *Ashcroft v. Iqbal*,[38] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[39] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption

---

[35]  Second Amended Complaint, Doc. 22 ¶¶48-55.
[36]  *See Potter v. Cozen & Connor*, 46 F.4th 148, 151 (3d Cir. 2022).
[37]  550 U.S. 544 (2007).
[38]  556 U.S. 662 (2009).
[39]  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[40]

Under Federal Rule of Civil Procedure 12(b)(1), "a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim."[41] The first step in evaluating a 12(b)(1) motion is to address whether it presents a "factual" or "facial" attack on the plaintiff's claims.[42] The "distinction is significant because, among other things, it determines whether we accept as true the non-moving party's facts as alleged in its pleadings."[43] A factual challenge asserts that the underlying facts of the case do not support jurisdiction.[44] When considering a factual challenge, a court may consider evidence outside the pleadings.[45] Further, the plaintiff bears the burden of contesting a factual challenge and proving that jurisdiction exists.[46] In contrast, a facial challenge contests the court's subject-matter jurisdiction "without disputing the facts alleged in the complaint, and it requires the court to 'consider the allegations of the complaint as true.'"[47] In effect, "the standard is the same when

---

[40] *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

[41] *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

[42] *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357-58 (3d Cir. 2014) (citation omitted).

[43] *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 625, 632 (3d Cir. 2017) (citation omitted).

[44] *Aichele*, 757 F.3d at 358.

[45] *Id.*

[46] *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).

[47] *Id.* (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006)).

considering a facial attack under Rule 12(b)(1) or a motion to dismiss for failure to state a claim under Rule 12(b)(6)."[48]

Here, neither defendants's motion to dismiss makes a factual attack upon Walsh's standing. Accordingly, whether it is a facial attack, a prudential standing argument, or a standard motion to dismiss on the merits of the claim, all the arguments in this case are to be evaluated under the same standard.

## IV.    ANALYSIS

Article III of the United States Constitution confines the federal judicial power to "Cases" and "Controversies." "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing."[49] To have standing, a plaintiff bears the burden of proving that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[50] An injury in fact is one in which plaintiff claims to have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"[51]

---

[48]    *Petruska*, 462 F.3d at 299 n.1.

[49]    *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (cleaned up)).

[50]    *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 338 (2016).

[51]    *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

"[E]lection law cases . . . present unique challenges to standing analysis."[52] Indeed, the standing issue in this case has resulted in much briefing. But the truth is that under this set of facts, the standing question has been obvious from the very start. Walsh no longer attempts to premise his standing to bring suit on his status as a voter[53] and must instead premise his standing on his status as a candidate. But an unopposed candidate who wins his office suffers no injury at all when voter registration and mail-in ballot procedures are followed imperfectly. "No concrete harm, no standing."[54]

There is "no authority to support" standing where plaintiffs merely "seek to protect the rights of all Pennsylvania voters."[55] Even the most broad articulations of candidate standing attempt to show some kind of injury to a candidate. The Third Circuit's dictum in the divided case of *Pennsylvania Psychiatric Society v. Green Spring Health Services, Inc.*, which concerned the standing of a physicians' association based upon injuries its physicians' patients, does not suggest otherwise.[56] Walsh points to the following sentence, which appears to facially support his argument: "doctors may be able to assert the rights of patients; lawyers may be able

---

[52] Steven J. Mulroy, *Baby & Bathwater: Standing in Election Cases After 2020*, 126 DICK. L. REV. 9, 14 (2021).

[53] Indeed, an affidavit attached from Emily Cook, the Director of Elections for Luzerne County, Pennsylvania, affirms that Walsh's voter registration was processed and that Walsh's "averments are categorically false." Luzerne County Court Documents, Doc. 1-2 at 79-81 (affidavit of Emily Cook).

[54] *TransUnion LLC*, 594 U.S. at 417.

[55] *Stein v. Cortés*, 223 F.Supp.3d 423, 433 (E.D. Pa. 2016)

[56] 280 F.3d 278, 288 n.10 (3d Cir. 2002) (2-1).

to assert the rights of clients; vendors may be able to assert the right of customers; and candidates for public office may be able to assert the rights of voters."[57]

The best rebuttal is to point to *Pennsylvania Psychiatric Society* itself. The footnote to which Walsh cites is providing examples of situations wherein third-party standing may be permissible.[58] Walsh does not appear to argue that he has third-party standing,[59] nor could he. As the *Pennsylvania Psychiatric Society* court went on to expound, "third-party standing requires the satisfaction of three preconditions: 1) the plaintiff must suffer injury; 2) the plaintiff and the third party must have a 'close relationship;' and 3) the third party must face some obstacles that prevent it from pursuing its own claims. It remains for courts to balance these factors to determine if third-party standing is warranted."[60] There is no credible argument that Walsh himself suffered injury, or that some obstacle prevents the voters themselves from pursuing their own claims.[61] Accordingly, the Third Circuit's statement that candidates "*may* be able to assert the rights of voters" is far from a definitive statement that they always can.[62] Nor are any cases based upon political

---

[57]  *Id.*

[58]  *Id.* at 288.

[59]  His reference to third-party standing is limited to a parenthetical discussing a case in one footnote. Doc. 41 at 8 n.2.

[60]  *Id.* at 288-89 (citing *Campbell v. Louisiana*, 523 U.S. 392, 397 (2002)).

[61]  It is unclear whether Walsh shares a "close relationship" with his constituents, but *Pennsylvania Psychiatric Society* at least appears to entertain this notion.

[62]  *Id.* at 288 n.10 (emphasis added); *see also Stein*, 223 F.Supp. 3d at 433-434 (interpreting *Pennsylvania Psychiatric Society* in the same way).

parties, which hinge upon associational standing, applicable to a candidate suing in his individual capacity.[63]

*Pennsylvania Psychiatric Society* itself sounds the death knell for Walsh's standing. For it correctly observes that outside of this third-party standing context, it "is a well-established tenet of standing that a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties."[64] Walsh has no personal stake in this case, nor may he premise his standing on fees incurred through this challenge, either in response to the allegedly insufficient electoral practices here or in response to the speculative possibility of their recurrence in the future.[65] Nor does there appear to be any other injury tied to his status as a successful and unopposed candidate, as the Court will now discuss.

As Walsh notes, the Eighth Circuit stated in *Carson v. Simon*, over a dissent, that "[a]n inaccurate vote tally is a concrete and particularized injury to

---

[63]  Walsh cannot rely upon associational standing, a theory he also never attempts to advance, because he brings suit as an individual and as such no organization's "members" are implicated. Even bringing the suit through his campaign would be insufficient. *See Donald J. Trump for President, Inc. v. Boockvar*, 502 F.Supp. 3d 899, 914-15 (M.D. Pa. 2020).

[64]  *Pa. Psychiatric Soc'y*, 280 F.3d at 288-89 (cleaned up).

[65]  *See Bost v. Ill. State Bd. of Elections*, 114 F.4th 634, 643 (7th Cir. 2024) ("Plaintiffs cannot manufacture standing by choosing to spend money to mitigate such conjectural risks" of electoral defeat.); *Bognet v. Sec'y of Pa.*, 980 F.3d 336, 352 (3d Cir. 2020), *vacated on other grounds sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) (holding that the case had subsequently become moot) ("The same can be said for Bognet's alleged wrongfully incurred expenditures and future expenditures. Any harm Bognet sought to avoid in making those expenditures was not 'certainly impending'—he spent the money to avoid a speculative harm. Nor are those expenditures 'fairly traceable under Article III to the actions that Bognet challenges.'") (citations omitted).

candidates."[66] Some district courts appear to have been persuaded by similar rationales.[67] But Carson is at least factually distinguishable, as it involved presidential electors, which the majority deemed to be losing "candidates" for office, who subsequently challenged an extended absentee ballot deadline—rather than unopposed and successful candidates such as Walsh.[68] In any case, the majority is unpersuasive. As Judge Kelly argued in dissent, the electors had no "particularized stake" in the outcome; this "claimed injury" of an inaccurate vote tally "appears to be 'precisely the kind of undifferentiated, generalized grievance about the conduct of government' that the Supreme Court has long considered inadequate for standing.'"[69] Along with this dissent, the Seventh Circuit has also cast doubt upon the *Carson* court's reasoning.[70] More importantly, controlling Third Circuit precedent rules out this approach to candidate standing.

In *Bognet v. Secretary Commonwealth of Pennsylvania*, the Third Circuit denied standing to a candidate for Congress who challenged the counting of absentee

---

[66]   978 F.3d 1051, 1058 (8th Cir. 2020) (per curiam) (2-1).

[67]   *See, e.g.*, *Gallagher v. New York State Bd. of Elections*, 477 F.Supp. 3d 19, 36 (S.D.N.Y. 2020) ("Candidates have an interest not only in winning or losing their elections, but also in ensuring that the final vote tally accurately reflects the votes cast . . . . Candidates also have an informational interest in an accurate count in their races. Whether counting additional ballots would increase the margin, strengthening the candidate's political hand, or decreases it, communicating to the candidate that she must make a more vigorous effort to win over the electorate, a candidate has a legally protected interest in ensuring that all valid ballots cast in her election are accounted for.").

[68]   *Id.* at 1054-55.

[69]   *Id.* at 1063 (Kelly, J., Dissenting).

[70]   *Bost*, 114 F.4th at 643.

ballots received within three days after Election Day after losing his election.[71] Rejecting the argument that counting such ballots would create a "'threatened' reduction in the competitiveness of his election," the Third Circuit provided the following reasoning:

> Bognet does not explain how counting *more* timely cast votes would lead to a *less* competitive race, nor does he offer any evidence tending to show that a greater proportion of mailed ballots received after Election Day than on or before Election Day would be cast for Bognet's opponent. What's more, for Bognet to have standing to enjoin the counting of ballots arriving after Election Day, such votes would have to be sufficient in number to change the outcome of the election to Bognet's detriment.[72]

This discussion is illuminating because it demonstrates how a losing candidate with a far more compelling argument for standing still could not prevail. *Bognet*'s general rationale was that to make a losing candidate's standing to challenge electoral practices non-speculative, two hurdles must be overcome: the number of challenged votes or the votes impacted by the challenged practice must be sufficient to swing the election, and the breakdown of the challenged votes must favor the plaintiff. *Bognet* therefore demonstrates how even a losing candidate must provide a non-speculative basis to believe that the practice he is challenging could change the outcome of the election in his favor.[73] So it is not clear whether a winning

---

[71]  980 F.3d at 351-52.

[72]  *Id.* at 351.

[73]  *Id.*; *see also Stein*, 223 F.Supp. 3d at 433-434 (losing candidate lacked standing, in part because no evidence showed that the requested remedy could change the outcome of the election); *Hunter v. Hamilton Cnty. Bd. of Elections*, 850 F.Supp. 2d 795, 803 (S.D. Oh. 2012)

candidate could ever demonstrate standing under *Bognet*. Regardless of whether *that* is possible, a candidate who is running unopposed certainly cannot show any injury under *Bognet* based on these facts.

It is therefore abundantly clear that Walsh never suffered any injury as a result of the electoral practices he alleged, and as an unopposed candidate faced no non-speculative risk of injury even at the time, before Election Day, when he filed suit. Walsh's mootness arguments therefore become moot themselves; with no injury-in-fact to begin with, the applicability of mootness exceptions becomes immaterial. And any fear of future injury in the 2026 election both conjectural and not ripe.[74] Because Walsh lacks standing, the motion to dismiss shall be granted.

## V.    LEAVE TO AMEND

This still leaves the question of leave to amend. Federal Rule of Civil Procedure 15(a) permits a party to amend a pleading "once as a matter of course at any time before a responsive pleading is served, which amendment takes place "without leave of court" in the "typical case."[75] After this first amendment, Federal Rule of Civil Procedure 15 conditions amendment on leave of court or consent of

---

(candidates have a "concrete, private interest in the outcome of [a] suit" where "treatment of the disputed ballots matters to the outcome of the . . . election."); *Trump v. Wisconsin Bd. of Elections*, 506 F.Supp. 3d 620, 631-33 (E.D. Wis. 2020), *aff'd*, 983 F.3d 919, 924-25 (7th Cir. 2020) ("[P]laintiff, a candidate for election, claims he was harmed by defendant's alleged failure to comply with Wisconsin law. Assuming he could prove his claims, he has suffered an injury. Plaintiff, as a candidate for election, has a concrete, particularized interest in the actual results of the general election").

[74] *See Carney v. Adams*, 592 U.S. 53, 60 (2020) (9-0).

[75] *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).

the opposing party. The law in the Third Circuit is clear that leave to amend should be "freely given"[76] because there is a "liberal pleading philosophy of the federal rules."[77] However, whether to grant leave to amend is a decision committed to the discretion of the district court.[78]

"[P]rejudice to the non-moving party is the touchstone for the denial of an amendment."[79] "Denial of leave to amend can be based on undue delay, bad faith or dilatory motive on the part of the movant; repeated failure to cure deficiencies by amendments previously allowed; prejudice to the opposing party; and futility."[80] A complaint is "futile" if even, as amended, it would fail to state a claim upon which relief could be granted.[81] Courts may also consider "additional equities," such as whether amendment would be an effective use of judicial resources.[82]

Looking to the factor of failure to cure deficiencies—which also speaks to the broader question of futility—the Court notes that Walsh has amended his complaint four times. The amended complaints repeatedly failed to fix the underlying clerical issues regarding the name of Defendant Luzerne County Bureau of Elections and

---

[76] *Cureton v. NCAA*, 252 F.3d 267, 272 (quoting Fed. R. Civ. P. 15(a)).
[77] *Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008).
[78] *United States ex rel. Schumann v. AstraZenica Pharms. L.P.*, 769 F.3dd 837, 849 (3d Cir. 2014).
[79] *Cornell & Co., Inc. v. Occupational Safety and Health Rev. Comm'n*, 573 F.2d 820, 823 (3d Cir. 1973).
[80] *Foman v. Davis*, 371 U.S. 178, 182 (1962).
[81] *Id.*
[82] *Mullin v. Balicki*, 875 F.3d 140, 150 (3d Cir. 2017) (citing *USX Corp. v. Barnhart*, 395 F.3d 161, 167-68 (3d Cir. 2004)).

Walsh's legislative district and, as discussed, more significantly failed to provide sufficient support for Walsh's standing. With respect to the original and first amended complaints, the Court notes that the rapidly evolving timeline of this election litigation arguably provides some excuse for the continued clerical errors. The same cannot be said for the second and third amended complaints, which Walsh had plenty of time to review. Yet the second amended complaint still misidentified Walsh's legislative district, and both added insufficient detail to establish Walsh's standing. In considering the insufficient addition of allegations to substantiate Walsh's standing, I note that this Court never explicitly ruled that any iteration of the complaint was insufficient, but also note the Court's continued concern that standing was lacking in this case. Overall, this factor weighs towards denying leave to amend.

The Court also considers whether Walsh had any dilatory motive in continuing to amend his complaint. In this regard, I note Defendant Luzerne County Bureau of Elections's concern in briefing that the amendments may well have been dilatory. According to this Defendant:

> Plaintiff's trivial alterations throughout his three amended complaints form the foundation of Moving Defendants' opposition and demonstrates Plaintiff's dilatory motive . . . . Plaintiff's repeated failures make sense since no amount of amendment will alter the utter lack of underlying factual support for Plaintiff's allegations. Additionally, Plaintiff's perpetual procession of pleadings prejudices

the Defendants by keeping alive baseless litigation which renders any further amendment futile.[83]

The Court notes these concerns and further observes that for his second and third amended complaints, Walsh waited some time after motions to dismiss had been filed to request leave to file second and third amendment complaints. This suggests that Walsh had not simply communicated with counsel to arrange a sufficient timeline to correct his complaint, instead waiting until before his brief in opposition was due and then filing his request for leave. This practice has contributed to extending this litigation from November 2024 until April 2025.

The Court further notes Walsh's decision to cancel the evidentiary hearing on the eve of the election. Although the hearing would have occurred at the eleventh hour, the Court's hands were not completely tied. For example, though such relief is extraordinary, the Court may have extended the deadline for affected voters if Walsh's claims proved true at the hearing.[84] So this factor also weighs in favor of denying leave to amend.

The most important factor here, however, is futility. At first glance, it should be noted that the Court has never actually passed upon the merits of the standing issue in this case, and so one might object that Walsh has never had an opportunity

---

[83]  Brief in Opposition, Doc. 39 at 7 n.2.
[84]  *See, e.g.*, *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 371 (Pa. 2020); *but see Merrill v. Milligan*, 132 S. Ct. 879, 880-81 (2022) (Kavanaugh, J., Concurring) (cautioning against "[l]ate judicial tinkering with election laws").

to add allegations in response to this Court's standing concerns. Yet I reference, again, the Court's explicit skepticism of standing both at the status conference and in its scheduling order, as well as the fact that standing was the focus of defendants' briefing in opposition to Walsh's first and second amended complaints. As the Court highlighted in its statement of facts, Walsh supplemented the second amended complaint with some allegations relating to his standing. But the basic story, and the primary standing objection, did not change: Walsh ran unopposed in the general election and he won.[85] The Court can therefore assume that this fact will not change in any subsequent complaints. And as the Court's analysis makes clear, this fact alone sinks Walsh's case. Accordingly, the Court simply cannot conceive of any set of facts which would resuscitate standing for a candidate who won the general election unopposed, but even if those facts exist, Walsh passed on multiple opportunities to set them out in his amended complaints. This factor weighs strongly towards denying leave to amend.

Having carefully considered the *Foman v. Davis* factors in light of the history of this case, the Court determines that granting leave to amend would prove futile in setting out Walsh's standing to bring this challenge, and would therefore fail to cure this deficiency, prolong an ultimately baseless case, impose needless costs upon

---

[85] Indeed, Walsh's argument for standing only deteriorated over time, following his victory in the unopposed general election.

Defendants, and waste limited judicial resources in resolving a future motion to dismiss. Accordingly, the Court shall deny leave to amend.

## VI.    CONCLUSION

Standing is not just a technicality or a method of evading review. "The 'law of Art. III standing is built on a single basic idea—the idea of separation of powers.'"[86] The framers of the Constitution were motivated by an "overriding and time-honored concern about keeping the Judiciary's power within its constitutional sphere."[87] As such, "Article III's case-or-controversy requirement restricts the democratically unaccountable federal courts to a purely adjudicatory role."[88] "Article III does not give federal courts the power to order relief to any uninjured plaintiff,"[89] nor does it give federal courts the power to render advisory opinions; rather, it limits the role of the courts to "to decide on the rights of individuals."[90] By denying standing to plaintiffs who lack a "personal stake in the outcome of the controversy,"[91] courts ensure "concrete adverseness which sharpens the presentation

---

[86]    *TransUnion LLC*, 594 U.S. at 422.

[87]    *Raines*, 521 U.S. at 820.

[88]    Martin H. Redish & Sopan Joshi, *Litigating Article III Standing: A Proposed Solution to the Serious (But Unrecognized) Separation of Powers Problem*, 162 U. PA. L. REV. 1373, 1380 (2014).

[89]    *Id.* at 431 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., Concurring))

[90]    *Marbury v. Madison*, 5 U.S. 137, 170 (1803).

[91]    *Sierra Club v. Morton*, 405 U.S. 727, 732 (1972) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

of issues upon which the court so largely depends for illumination of difficult constitutional questions."[92]

Standing requirements also guard against weaponizing the judicial process in ways that would disrupt our constitutional order. When truly aggrieved parties seek relief in the elections context, the judicial role of resolving cases and controversies is vital to our system of checks and balances. Because "[f]ree and fair elections are the lifeblood of our democracy," such "[c]harges of unfairness are serious."[93] But those serious charges can have serious implications, even where the claims of unfairness reduce to nothing more than casting aspersions for political purposes. So the Court should not entertain such charges lightly.

"The degree to which the courts become converted into political forums depends not merely upon which issues they are permitted to address, but upon *when* and *at whose instance* they are permitted to address them."[94] The "injury-in-fact requirement . . . can effectively prevent what Tocqueville called 'wanton assaults' on legislation resulting from 'the daily aggressions of party spirit.'"[95] Allowing

---

[92] *Baker*, 369 U.S. at 204.

[93] *Donald J. Trump for President, Inc. v. Sec'y of Pa.*, 830 F.App'x 377, 381 (3d Cir. 2020) (Bibas, J.).

[94] Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U.L. Rev. 881, 884 (1983))

[95] Redish & Joshi, 162 Pa. L. Rev. at 1384 (quoting 1 A. De Tocqueville, Democracy in America 102 (T. Bradley ed. 1945)); *see also Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 438 (2017) (quoting *Clapper*, 568 U.S. at 408) ("The law of article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches.").

parties who have suffered no injury to challenge electoral practices opens the floodgates to bad actors, who may seek to wield the judicial process for other purposes. Accordingly, standing requirements are not mere technicalities, or methods of evading review. They are critical safeguards to the integrity of our constitutional order and the electoral process itself, and ensure that the scope of judicial intervention in that process is properly constrained.

Accordingly, the motion to dismiss will be granted.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge